IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 8:18-389-HMH |
| | ) | |
| | ) | **GOVERNMENT'S SENTENCING** |
| vs. | ) | **MEMORANDUM AND, IN THE** |
| | ) | **ALTERNATIVE, MOTION FOR** |
| **WESLEY DALLAS AYERS,** | ) | **UPWARD VARIANCE** |
| Defendant. | ) | |

NOW COMES the United States, by and through its undersigned attorney, and submits this memorandum in support of its request that the defendant, Wesley Dallas Ayers, be sentenced to 480 months. The Presentence Report (PSR) prepared by the United States Probation Office (USPO) in this case recommends Life imprisonment. (PSR ¶ 81.) To the extent it is procedurally necessary based on certain stipulations of the parties, as will be discussed *infra*, the government also moves pursuant to Sections 5K2.0, 5K2.6-.8 of the United States Sentencing Guidelines and Title 18, United States Code, Section 3553(a) and (b), that this Honorable Court depart upward from any stipulated advisory guidelines eventually adopted by the Court.

In support of its sentencing request, the government intends to call its case agent, Theodore Soscha, a special agent with the Federal Bureau of Investigation to offer some brief additional testimony. During his testimony, the government anticipates that it will play a video from one of the incidents at issue in this case.

## PROCEDURAL HISTORY

On April 11, 2018, a Grand Jury sitting in the District of South Carolina returned a twelve-count Indictment charging the defendant with violations of Title 18, United States Code, Sections 844(d); Title 18, United States Code, Sections 844(h); Title 18, United States Code, Section

1

924(c); and Title 26, United States Code, Section 5861(d). (ECF No. 23.) On May 15, 2018, the defendant was arraigned in federal court. (ECF No. 49.) At that time, the defendant was ordered for a psychiatric examination. (ECF No. 46.) The defendant did not appear again in federal court until September 25, 2018, for his competency hearing. (ECF. No. 62.) The Court granted a continuance at an October 9, 2018, pretrial conference. (ECF No. 69.) The defendant, thereafter, pled to an Information, on October 26, 2018. (ECF. 77-79.) Specifically and pursuant to a plea agreement, the defendant pled to violations of Title 18, United States Code, Sections 2332a; Title 18, United States Code, Sections 844(h); and Title 18, United States Code, Section 924(c). (ECF No. 75, 77.)

## **FACTUAL BACKGROUND**

The defendant has pled guilty to charges related to his having placed six devices, three with live explosives and three with hoax or non-live explosives, in Anderson County, South Carolina, between January 24, 2018 and February 24, 2018.

On January 30, 2018, (hereinafter Incident No. 2)[1] at approximately 9:00 p.m., a Kenneth Bearden and his fourteen year-old daughter were driving east on Travis Road in Anderson County, South Carolina. (PSR ¶ 9.) As their vehicle approached the stop sign at the intersection of Travis Road and Martin Road, they observed an apparent box resting in the middle of the roadway on the stop line at the intersection. *Id*. The box was constructed of a wicker-type material and had a green light emanating from inside the box. *Id*. Mr. Bearden initially stopped his Chevrolet Tahoe just past the box and then backed the vehicle up so the box was adjacent to the driver's door. Mr. Bearden stepped out of the vehicle to more closely observe the green light and

---

[1] Although the first device discovered by law enforcement, as will be explained, the January 30 device was actually the second one placed by the defendant.

metal objects inside the box.  *Id*.  When Mr. Bearden opened the lid, he heard clicking noises and then an explosion occurred.  *Id*.  Mr. Bearden received burns and small lacerations to his legs but was not seriously injured.  *Id*.  After the incident was reported to 911, deputies from the Anderson County Sheriff's Office (ACSO), including the ACSO bomb squad, quickly responded to the scene.  Special Agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) were contacted and arrived at the scene a short time later.  Based on the review of surveillance camera footage from a nearby residence, witness interviews and preliminary examination of the evidence, it is believed that the device functioned when Mr. Bearden lifted the lid of the wicker box causing injuries to himself and damage to the automobile and roadway.  *Id*. ¶ 10.

Between January 30 and 31, 2018, investigators processed the scene, to include taking photographs and collecting evidence.  *Id*. ¶ 11.  The intersection at Travis Road and Martin Road was closed to traffic in all directions for approximately five hours.  *Id*.  The seat of the blast was located on Travis Road just next to the stop line, consistent with Mr. Bearden's statement, and caused damage to the asphalt.  *Id*.  A preliminary examination of the evidence revealed that the wicker box contained a suspected destructive device.  *Id*.  The blast-damaged components of the device consisted of an apparent metal automotive oil filter, AA batteries, wires, an improvised clothes pin switch, monofilament fishing line, a folded piece of paper attached to the fishing line, a possible electronic slide switch, suspected explosives powder and a green cyalume (glow) bracelet/stick.  *Id*.

Also, included among the post blast debris were fragments of paper that appeared to depict a picture of the White House with a black flag flying from the roof; Arabic writing was visible in

portions of the photograph.  *Id*. ¶ 12.  The picture and writing appeared to be a printed or photocopied document.  *Id*.  Initial analysis of the fragments by the Federal Bureau of Investigation (FBI) determined that the flag in the photo was known to be representative of the "Black Banner of Jihad" which is utilized by the Al Qaeda and the Islamic State of Iraq and Syria or "ISIS."  *Id*.  The Arabic writing translated into "Allah is Greatest" and "Mother of the Mujahideen."  *Id*.

On January 31, 2018, investigators received information that an area resident had posted a photograph and accompanying narrative on Facebook relating to a box containing a "pipe bomb" that he had found along a roadway, on January 24, 2018, (hereinafter Incident No. 1), prior to the January 30 explosion.  *Id*. ¶ 13.  ACSO, ATF, and FBI investigators subsequently interviewed the resident who advised that, on January 24, 2018, at approximately 6:30 a.m., he was driving on Martin Road when he observed a small box next to the guardrail on a bridge over a creek.  *Id*.  The resident stated that the box looked like a jewelry box or treasure chest made of wood with brass or gold bands on the outside.  *Id*.  The resident had stopped his vehicle, picked up the box, and shook it slightly to determine if it contained anything.  *Id*.  He indicated that the box was moderately heavy and seemed to have something inside.  *Id*.  The resident had opened the lid and observed what he believed to be a possible "pipe bomb" with wires coming from it and going to the lid.  *Id*.  The resident stated that the device was shiny or galvanized metal, approximately 5-6" in length, 2-2.5" in diameter and wrapped with black, electrical tape.  *Id*.  The resident indicated that he then set the box back down and departed the area before returning with a co-worker, at approximately 6:50 a.m. who also examined the box.  *Id*.

Investigators also interviewed the co-worker.  *Id*. ¶ 13. The co-worker similarly described

the box. *Id*.

Subsequent to the January 30 explosion, a small black box was discovered at approximately 2:50 p.m. on February 4, 2018, along Highway 29 in Anderson County (hereinafter Incident No. 3). *Id*. ¶ 14. ACSO, ATF and FBI investigators responded to the scene where bomb technicians x-rayed and examined the box. *Id*. The black box was hard, made of plastic, and had an electronic window alarm with a small, plastic illuminating ball taped to the outside. There was also black electrical tape and red wires protruding from inside the box. *Id*. Inside the box, investigators found a type written, three-page letter that included statements referring to the "Islamic state and flag," "jihad," "the ignorance of the United States," the "package", and that "Tuesday was just a practice run." *Id*. ¶ 16. The letter essentially claimed responsibility for the incidents and made threats to use "more powerful tools" in the future. *Id*.

On February 15, 2018, (Incident No. 4), at approximately 10:18 p.m., the ACSO received a call from a complainant who said that she was driving along Little Mountain Road in Anderson, South Carolina when she observed a suspicious package sitting on the double yellow lines in the middle of the two-lane road. *Id*. ¶ 17. The ACSO, South Carolina Law Enforcement Division (SLED), the ATF, the United States Secret Service (USSS), and the FBI reported to the scene where bomb technicians x-rayed and examined the package. *Id*. The x-ray and examination revealed that the package was a basket that contained a stuffed teddy bear toy. *Id*. An x-ray revealed that the teddy bear contained a sealed pipe with fragmentation inside, possibly nails. *Id*. There were also batteries and wires attached to the pipe. Bomb technicians conducted a "render safe" disruption of the batteried ignition system by using a precision grid shot. *Id*. After the render safe disruption, bomb technicians utilized special equipment to remove the pipe and wires.

Id. Upon examination, the pipe appeared to be copper. *Id*. Further render safe operations were conducted and the pipe was transported via secure containment vessel to a safe location where final render safe operations were conducted. *Id*.

On February 18, 2018, (hereinafter Incident No. 5), at approximately 7:16 a.m., the ACSO received a call from another County resident who said he was driving along Highway 29 South in Anderson, South Carolina when he observed a suspicious package sitting on the double yellow lines in the middle of the road. *Id*. ¶ 18. The ASCO, the USSS, Greenville County Sheriff's Office (GCSO), and the FBI responded to the scene where bomb technicians x-rayed and examined the package. *Id*. The x-ray and examination revealed that the package was a black wooden box wrapped in black electrical tape with white and grey wires protruding out from the top of the box. *Id*. The x-ray and examination of the box also revealed that the box did not contain any explosive material and was determined to be safe to handle. *Id*. Inside the box investigators found a two separate hand-written messages. The first message stated: "We The 19 Lions of ummah Pledge our allegiance To the Islamic State! Insha ALLAH Your county will soon understand That you are No Longer Safe! These littel Boxes WERE ONLY PRACTICE RUNS!! THE TIME IS ALMOST UPON YOU!!!" *Id*. The second message stated: "Were 30 MILeS AWAY BUT NOT Telling You The DIRECTION". *Id*.

Finally, on February 24, 2018 (hereinafter Incident No. 6) at approximately 1:51 a.m., the ASCO received a call reporting a suspicious package in the road at the intersection of Travis Road and Little Mountain Road in Anderson, South Carolina. *Id*. ¶ 19. Bomb technicians from the FBI and ACSO again x-rayed and examined the suspicious package. *Id*. The x-ray and examination revealed that the suspicious package was likely an improvised explosive device that

had an ignition switch powered by a battery. *Id*. It further revealed the suspicious package was a wooden box with dark writing on the outside that appeared to be in Arabic and Farsi. *Id*. There were also pipes inside the box. *Id*. Bomb technicians conducted a rendered safe disruption of the possible ignition system by using a precision grid shot, which made the device inoperable. *Id*.

On March 2, 2018, based on the foregoing and other information, which will be discussed *infra*, the government submitted to the Honorable Kevin F. McDonald, an affidavit in support, application, and search warrant for a search of the defendant's residence at 909 Travis Road, Anderson County, South Carolina, which he signed. On March 3, 2018, the FBI executed the search warrant. *Id*. ¶ 34. Innumerable items consistent with the hoax and live devices and bomb making materials were found on the defendant's property, including many components that were inside an ottoman that was buried in the ground. *Id*. Additionally, multiple bottle, or "overpressure", bombs were found throughout the property and adjacent properties.

Forensic examination revealed that the the defendant's fingerprints and DNA were found on certain of these devices. *Id*. ¶ 35.

## **ARGUMENT**

Pretrial services has prepared a thorough report concerning its sentencing recommendation to the Court; discovery was voluminous.

Based on application of the 12-Level Terrorism Enhancement in United States Sentencing Guideline § 3A1.4(a) (PSR ¶ 52), the PSR recommends a sentence of Life imprisonment (PSR ¶ 81). As the Court is aware, however, the parties stipulated that that specific enhancement should not apply, although the plea agreement admits that such stipulation is not binding on the Court.

(ECF No. 75 ¶ 13.) The USPO acknowledged this stipulation at paragraphs 83-85 of the PSR. (PSR ¶¶ 83-85.) Based on this stipulation, and in the absence of the Terrorism Enhancement, the defendant's Guidelines recommendation of 361 to 391 months. *See id*.

The plea agreement between the parties, however, also expressly indicated that "[t]he Government shall seek a sentence of 40 years imprisonment, in addition to other applicable penalties and terms of supervision." (ECF No. 75 ¶ 12.) **Accordingly, the government is seeking a sentence of 480 months**.

The defendant committed serious crimes against the citizens of Anderson County, and although he was originally resistant, he ultimately admitted responsibility. For this reason, the parties worked diligently to identify a plea vehicle and agreement that were simultaneously reflective of the severity of his conduct but still proportional based on the defendant's age, upbringing, and criminal history. Counsel for the government and the defendant were also mindful to avoid unnecessary expense and resource, to try an already conceded case. With these interests in mind, the parties believed that the stipulations, as detailed above, allowed the government to argue its position as to a just outcome while affording the defendant an opportunity to do the same.

In support of its request for 480 months, the government would emphasize the following about the defendant's conduct:

- He placed three, live explosive devices that could have caused, indeed were intended to cause, serious bodily harm, and one did. The first live device, placed on January 30, 2018, exploded injuring an adult male in the presence of his 14-year-old daughter who was in the car at the time. (PSR ¶ 9.)
- The second live device, placed on February 15, 2018, was of the most nefarious kind insofar as it smuggled the explosive device inside the body of a teddy bear,

- which is a child's toy. *Id*. ¶ 17. In this sense, it was a genuinely sadistic Trojan horse.

- The defendant additionally weaponized at least two of the explosive devices, on February 15 and February 24, 2018, respectively, with shrapnel, including nails and .22 caliber rounds and pieces of shotgun shells, which evidence a desire to exacerbate the intended harm to victims – namely, complete strangers. *Id*. ¶ 17.

- In addition to these live devices, the defendant also placed three hoax devices, which were a part of his larger campaign to threaten community members and seek public and media attention for his exploits. *Id*. ¶¶ 13, 14-15, 18. These hoax devices had the exacerbating effect of prolonging community fear and monopolizing, literally day and night, law enforcement resources. So while this case involves one physical victim, in truth the entire County was victimized, in both fear and disruption.

- The defendant employed threatening rhetoric and promises with these devices, to include that more, and more powerful, weapons would be used in the future. *Id*. ¶¶ 14-18. It is not an exaggeration to say that Anderson County, South Carolina was some hostage to these threats for a month's time. This impact was manifest in the urgent and affirmative actions of citizens to report items in the roadway that would otherwise almost uniformly have been ignored by the trafficking public. *Id*. ¶¶ 9, 13, 14, 17, 18, 19.

- For nearly a month, the identity of any suspect was unknown to law enforcement. As a result, the broadest investigation and manhunt was required. As the discovery and pre-indictment docket indicates, law enforcement was required to deploy every investigative technique at its disposal including, high-risk and technical render-safe procedures; aerial helicopter surveillance; hundreds of interviews; tens of hours of video footage review; numerous data "dumps" from entire cell towers; myriad pole cameras and license plate readers; extensive social media and other technology search warrants; weekday and weekend door-to-door neighborhood canvassing; and a dangerous and complex day-long search of three properties. (*See id*. ¶ 20.)

- More than six distinct federal and state agencies participated, including the Federal Bureau of Investigation; Alcohol, Tobacco, Firearms and Explosives; the United States Secret Service; the Anderson County Sheriff's Office; Spartanburg County Sheriff's Office; and the South Carolina Law Enforcement Division.
- Hundreds of law enforcement agents participated in the investigation. *See id*.
- Bomb technicians from at least four separate South Carolina Counties and SLED were present at the six incident sites.
- Federal Bureau of Investigation teams out of Ohio and Georgia were required for various specialized operations.
- By their nature, the crimes in this case were latent, unpredictable, and uniquely dangerous to the community and law enforcement as the investigation proceeded, day and night through the months of January and February.

The government asserts that based on the PSR and its Guidelines recommendation of Life, the Court has full authority to award 480 months as requested by the government.

To the extent the Court determines that an upward variance is necessary to accomplish this outcome, the government would so additionally move.

The stipulated guidelines range of 361-391 months would not adequately account for the nature of the devices; the community fear; and the monopolization of law enforcement resources and personnel. As the plea agreement contemplates, the government would request some additional upward variance from the recommended stipulated Guidelines sentence based upon a consideration of the statutory factors outlined in 18 U.S.C. § 3553(a) and (b) and relevant Guidelines provisions.

As the Court is well aware, in determining the particular sentence to be imposed, it shall consider

> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed—

    **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    **(B)** to afford adequate deterrence to criminal conduct;

    **(C)** to protect the public from further crimes of the defendant; and

    **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for--

    **(A)** the applicable category of offense committed by the applicable category of
defendant as set forth in the guidelines—
        (i)    issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

        (ii)    that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

    **(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

**(5)** any pertinent policy statement—

> **(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
>
> **(B)** that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.
>
> **(6)** the need to avoid unwarranted sentence disparities among defendants with similar    records who have been found guilty of similar conduct; and
>
> **(7)** the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)

"The judge need not address every factor in checklist fashion, explicitly articulating its conclusions regarding each one. . . . [T]he court may simply give an adequate statement of reasons, consistent with § 3553(a), for thinking the sentence it selects is appropriate." *United States v. Kappes,* 782 F.3d 828, 845 (7th Cir. 2015) (internal quotation marks and citations omitted). To the extent "the sentencing range under the Guidelines fail[] to account for" certain of these statutory factors or to account for them sufficiently, the Court may vary upwards. *See United States v. Hernandez-Villanueva*, 473 F.3d 118, 123 (4th Cir. 2007); *see also* 18 U.S.C. § 3553(b); United States Sentencing Guideline § 5K2.0.

 "A deferential abuse-of-discretion standard applies to any sentence, whether inside, just outside, or significantly outside the Guidelines range*." United States v. Rivera-Santana*, 668 F.3d 95, 100–01 (4th Cir. 2012) (internal quotation marks and citations omitted).

The stipulated guidelines range of 361-391 months would either fail to account for, or to account for fully, the following statutory and guidelines factors:

- **The nature and circumstance of the offense** 18 U.S.C. § 3553(a)(1).
    - The Guidelines do not contemplate the more sadistic elements of the devices placed by the defendant, namely their concealment inside of household and child-related objects, innocuous to an unsuspecting public. (PSR ¶¶ 9, 13, 14, 17, 18, 19.)
    - The Guidelines do not account for the fact that the defendant additionally weaponized some of the explosives with shrapnel to maximize injury. *Id.* ¶ 17.
    - The Guidelines do not account for the placement of the devices in or besides roadways with the intent to invite attention from literally arbitrary strangers. *Id.* ¶¶ 9, 13, 14, 17, 18, 19.
    - The Guidelines also do not account for the fear and community impact on the citizens of Anderson County during the many weeks manhunt.
    - These dangerous- and weapons-related elements of the offense are specifically contemplated by the Guidelines as grounds for an upward variance. *See* United States Sentencing Guideline §§ 5K2.7 ("Weapons and Dangerous Instrumentalities"), 5K2.8 ("Extreme Conduct). And, while the defendant has pled to a Weapons of Mass Destruction and other explosives and firearms charges, these counts do not actually include, and the relevant Guidelines do not enhance for, these particular characteristics as outlined – namely, their attractive nuisance, location, and cruelty elements.

- **The characteristics of the defendant** 18 U.S.C. § 3553(a)(1)

    o   The defendant's Criminal History Category I underrepresents his association and history with explosive devices and the risk he poses long-term to the community. There is evidence that the defendant made explosives over a period of time, leading up to the conduct at issue in this case, to include the threatened "booby trapping" of buildings on his own property. *Id.* ¶ 21-27. The ongoing threat implied by this historical behavior is consistent with the literal threat he made to use "'more powerful tools' in the future." *Id.* 16.

    o   To this end, the Criminal History Category also underrepresents the risks the Defendant poses insofar as it does not reflect any consideration of the evidence of the defendant's historical violence towards animals. *Id.* ¶ 26; *see* United States Sentencing Guideline § 5K2.8 ("Extreme Conduct).

- **Disruption of Government Function** United States Sentencing Guideline § 5K2.7

    o   As detailed above and as would be shown additionally at the sentencing hearing, the defendant's behavior monopolized massive amounts of human capital and law enforcement resources over a month's time in a way that necessarily compromised the ability of those same government agencies to otherwise render to the community execution of their normal duties. *See United States v. Hart*, 803 F. Supp. 53, 67 (E.D. Mich. 1992), aff'd, 70 F.3d 854 (6th Cir. 1995) (applying Section 5K2.7, in part, where "evidence at trial also established that he diverted police personnel from their

responsibilities to the public in order to provide inordinate security to the mayor and his relatives, and to assist the Chief himself in his own personal business and affairs.").

In this case and in light of the defendant's relevant conduct, he has demonstrated the inclination, opportunity, information, and resources to carry out serious explosives and weapons crimes against the citizens of South Carolina. And, even as he has expressed some colorably sincere remorse for his conduct, the evidence in this case is suggestive of a disposition to act out sadistically towards others and little evidence of an ability to stop. The government has wanted to be proportional. And, in light of the seriousness of his conduct and his actual Life exposure under the Guidelines, the government believes 480 months satisfies the ends of punishment contemplated by Congress and the Guidelines – that the community be made safe and the defendant punished – but also the need to be accurate in light of the specific characteristics of this defendant. It is the government's view that anything less than 480 months, however, might jeopardize that delicate balance.

## **CONCLUSION**

For all of the foregoing, the government would respectfully request that the Court sentence the defendant to 480 months.

                                      Respectfully submitted,
                                      SHERRI A. LYDON
                                      UNITED STATES ATTORNEY

                              By:    s/ D. Josev Brewer
                                      D. Josev Brewer
                                      Assistant United States Attorney
                                      55 Beattie Place, Suite 700
                                      Greenville, SC 29601
                                      No. 9188

January 14, 2019